UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

SHELLEY FEDERICO, et al.,

      Plaintiffs,

v.                                     Case No.: 2:12-cv-80

LINCOLN MILITARY HOUSING, LLC, et al.,

      Defendants.

## OPINION AND ORDER

In these consolidated claims for personal injury and property damage allegedly arising from mold in military housing, contentious discovery disputes have produced 28 contested motions, including several motions for sanctions and reciprocal requests for costs and fees related to the parties' alleged non-compliance. The Court resolved most of the previous disputes from the bench, or in brief written orders entered after oral argument. (ECF Nos. 110, 182, 249, 279, 315, 325, 337, 362, 370, 384, 387, and 391). This Memorandum Order resolves the most contentious and expensive disagreement involving the Defendants' requests for Plaintiffs' electronic media, including text messages, email and social media posts.

In the sixteen consolidated cases, eight military families filed suit with allegations primarily against Defendant Lincoln Military Housing, LLC ("Lincoln"), a contractor engaged by the United States Military to manage government-owned housing used by active duty military. The Plaintiffs allege various illnesses and property damage they experienced were caused by Lincoln's failure to maintain the properties, or properly remediate the properties after mold was discovered. Lincoln, and the other Defendants alleged to be responsible for the

deficient response, deny liability.[1]

## I. FACTUAL BACKGROUND

Even before suit was filed, Lincoln was aware that some of the Plaintiffs were very active users of email and social media. Lincoln's attorneys had visited Plaintiffs' publically available Facebook pages, as well as Facebook groups and other pages set up specifically to deal with the issue of mold and mold-related injuries. As a result, in January 2012 defense counsel sent a preservation letter to the first identified Plaintiff, Shelley Federico, roughly three months after she moved out of the subject housing, see Compl. ¶ 56 (ECF No. 1-1, at 16-17). The letter, directed to her counsel, outlined Defendants' requests that she preserve and eventually produce electronic media. Among other things, the letter purported to require Ms. Federico to preserve:

1. Internet and web browser history files.
2. Potentially relevant texts and email messages.
3. Social media postings concerning their claims in the lawsuit and claimed damages.
4. Any photo or video images of the subject properties.

The four-page letter also demanded that Ms. Federico and her counsel make a written response confirming their receipt of the letters, their understanding of the obligations they impose, and that they "have imaged their computers and related devices." (ECF No. 285-2, at 22).[2] Thereafter, as suits commenced discovery was permitted but the District Court limited discovery to issues involving liability which were then set for a consolidated trial in October, 2014. Defendants served interrogatories and requests for production seeking all of this material from each Plaintiff.

---

[1] Plaintiffs' allegations are reviewed in greater detail in the Court's Opinion and Orders on Plaintiffs' Motion to Remand, see 901 F. Supp. 2d 654, and Defendants' Motions to Dismiss, see 2013 WL 5409910.

[2] It is not clear from the record whether any other Plaintiff received a preservation letter. Plaintiffs' counsel asserted that no other Plaintiffs received a separate letter and defense counsel did not contest this assertion in reply. All Plaintiffs are represented by the same attorney. Neither Ms. Federico nor her counsel agreed to the demand for written confirmation.

Although the detailed preservation letter should have signaled to Plaintiffs' counsel the seriousness with which Defendants would pursue electronic discovery, their initial response included almost no production of electronic records.  In fact, most of the Plaintiffs produced no electronic media of any kind.  Those that did, produced only a few printed copies of emails, but no original emails, no social media posts and no text messages.

On June 4, 2014, the Court held the first hearing on discovery disputes, which came on Plaintiffs' motions for Protective Orders seeking relief from Defendants' requests for production, and certain subpoenas. E.g., (ECF Nos. 211, 228).  For unrelated scheduling purposes, many of the Plaintiffs were present in court at the hearing.  In response to Defense counsel's description of the meager production, Plaintiffs' counsel made a familiar assertion, advising the Court that he had not withheld anything, but had produced all electronic media which had been provided to him by his clients.  He then noted that his clients were "heavy users of email" and that he perceived they did "not quite understand how comprehensive [their production] had to be." (ECF No. 259, at 22).  The Court admonished the assembled Plaintiffs to turn over related material to their attorney and permit counsel to determine whether it was relevant.  The Court also advised the Plaintiffs that there could be consequences if materials were not provided as required by the Rules. Id. at 29-30.  The Court also retained under advisement Lincoln's request for costs and fees associated with the lack of production.

Despite the Court's guidance, the Plaintiffs produced few additional emails, but continued to communicate with counsel concerning their ongoing efforts to search for electronic media and produce additional responsive material.  On June 23, 2014, Defendants filed a motion to compel various forms of discovery.  (ECF No. 263).  On June 24, Plaintiffs produced a supplemental production of the then-seven families involved in the consolidated cases.  The

3

supplemental production did include additional email and social media posts, but five families produced no social media and of the two that did, only a handful of posts were provided in hard copy.  On June 25, 2014, the Court held a second previously scheduled hearing and reviewed additional arguments on compliance.  Defendants again expressed their disbelief that Plaintiffs' production was complete, particularly with regard to their extensive use of social media. Plaintiffs seemed to concede the point, with their counsel stating they had engaged an outside vendor, Sensei Enterprises, to provide estimates and design a search protocol for electronic media.  Later the Plaintiffs received a cost estimate for Sensei's work to perform "email and social media recovery" from Plaintiffs' accounts.  (ECF No. 284, at 9).  The proposal described costs which were then estimated to be $22,450.00, and Plaintiffs requested that the Defendants agree to bear this cost of electronic production.  The Court did not order a forensic exam nor allocate the expected cost to the Defendants, as it perceived that additional production by a thorough self-directed search would yield sufficient results.

On July 10, 2014, Plaintiffs requested an emergency hearing in an effort to extend the Court's previously imposed deadline for production of electronic records.  The hearing convened by phone and Plaintiffs' counsel again explained that the volume of material to be searched could not be completed prior to the extended deadline which was then set at July 17, 2014.[3]  (Tr., ECF No. 286).  After hearing Plaintiffs' arguments and Defendants' response, the Court declined to extend the deadline and advised Plaintiffs' counsel that if Plaintiffs were unable to produce any more responsive documents, they were required to advise the Court and Defendants of the nature of any search they had performed.  Specifically, the Court required that they advise in writing the nature of the accounts they had examined, what folders and materials were present in

---

[3] The consolidated trial previously scheduled for October, 2014 was later continued for other reasons, and is presently set for April, 2015.

the accounts, including the last available dates of materials presently saved and accessible to them, in order to establish whether their failure to produce materials resulted from routine deletion or from some other obstacle. (ECF No. 286, at 15).

The Court was reluctant to allocate responsibility for the contractor's estimated cost of reviewing the Plaintiffs' various email accounts and social media noting that the electronic data should be available to the individual Plaintiffs. The Court provided the following direction to the parties:

> This data is available to them and they should be able to get it, and it's crazy to have to pay somebody $22,000.00 to do what they should be able to do within a matter of an hour or an hour and a half of looking through their own files. And if they are unwilling to do that, then I will entertain a request for sanctions. <u>And those sanctions may include the cost of having a professional engaged to produce them.</u> So you should share your cost estimate with your clients, because it is within the Court's power, if there has been noncompliance, to order them to pay those costs . . . . I'm going to require that they produce those materials and an explanation of how they examined their own social media and email accounts to generate the responsive materials. So if they're producing zero, there had better be a very detailed explanation of where they looked.

<u>Id.</u> (emphasis added).

The Plaintiffs failed to meet the July 17 production deadline, but they did produce letters describing their search criteria. The letters varied widely in the diligence reported. Some Plaintiffs produced detailed descriptions of their extensive efforts to identify responsive email and social media. Others indicated they had turned over account names and passwords and left the matter entirely in the hands of their attorneys. The lead Plaintiff, Ms. Federico, described in precise detail the correct method for downloading Facebook's activity log, but it appears no other Plaintiff was instructed on how to accomplish this relatively straightforward task.[4] A few specifically referenced their decision to pay a portion of the cost to retain an expert to search and

---

[4] Facebook also provides detailed guidance on the information available and the process for downloading a copy. Accessing Your Facebook Data, facebook.com/help/405183566203254 (last visited December 17, 2014).

produce their electronic data, although the Court had not imposed the use of a forensic expert or allocated the cost.

On July 31, 2014, Defendants filed their Motion for Sanctions. (ECF No. 309). The supporting brief argued that Plaintiffs' failure to produce texts, email, and other electronic media had severely compromised Defendants' ability to proceed with depositions and prepare for trial. The motion sought only one sanction, dismissal of Plaintiffs' claims for failure to comply. Plaintiffs opposed the sanctions motion (and several others), and on August 20, 2014, the Court heard oral argument on the outstanding discovery matters. Relevant to this dispute, Plaintiffs proffered at that hearing that they had engaged their IT consultant, who was working to search and produce relevant records, primarily from social media. The consultant was present and described the ongoing process for searching and processing the Facebook records using previously agreed upon search terms. He stated that the process of analyzing the records had produced 4.2 million "artifacts" from the parties' various Facebook accounts, a number which eventually rose to 4.5 million artifacts from fifteen different accounts. (Decl. of John McCabe, ECF No. 389-1, at 93). He stated that he expected the eventual production after applying the search terms and eliminating duplicates to include thousands, or perhaps tens of thousands of records.

At the hearing, the Court noted that the information sought was discoverable and had not been timely produced despite the Court's order. Nevertheless, the undersigned expressed skepticism that the material eventually produced would yield much that was relevant to the liability phase of the trial. As a result, the Court deferred any ruling until after the consultant's production, but observed at the hearing:

> I'm not going to make any final decision [on a sanction] until I know what is disclosed in the Facebook materials because I have the same concern that you just

6

articulated, and that is that if Sensei produces 30 pages of material and there's three relevant posts, then I'm not going to be inclined to fashion much of a sanction for not producing more email. But on the other hand, if that Facebook material produces 50 or 60 highly relevant instances of inconsistent statements, then I might well have to fashion a more severe sanction for them not having access to the other electronic records.[5]

(ECF No. 338, at 170).

In September, Plaintiffs produced the results of their consultant's search, including over 5,000 records from social media. Almost immediately thereafter, Defendants began deposing Plaintiffs and other witnesses. In November, the parties filed supplemental briefing on the outstanding issue of sanctions relating to production of electronic media. Defendants' briefing argues that the September production, combined with other records already produced, is still inadequate and that the relevance of the material which was produced demonstrates the severe consequences flowing from data which Defendants contend is missing, lost or destroyed. Plaintiffs responded and argued the exact opposite. They claim that the material already produced – over 5,500 Facebook posts and over 1,300 emails – includes almost all of the discoverable electronic evidence, and demonstrates the minimal relevance of the electronic media to the liability issues which will be contested in the April trial. In addition, Plaintiffs contend that any material omitted resulted from their clients' inexperience in managing electronic production and not from bad faith or intentional destruction of evidence. Combined, the parties' briefing and exhibits on this motion alone totals 2,233 pages. See (ECF Nos. 310, 330, 332, 373, 389, 392). Again, the only sanction Defendants specifically request is dismissal, but their brief also refers more generally to "those sanctions [the Court] deems appropriate against Plaintiffs and their counsel." (ECF No. 373, at 30).

After reviewing the parties' briefing, exhibits, and the five-month history of the discovery

---

[5] Later in this same exchange the Court observed that text messages would not likely be encompassed in this evaluation, given the marginal relevance of such records. (ECF No. 338, at 170-71).

disputes over this and other evidence, the Court, for the reasons that follow, declines to impose any further sanction against Plaintiffs beyond the $29,000 expense associated with their expert's production of the Facebook records, but will award a portion of the reasonable attorney's fees associated with the original motion to compel. (ECF No. 263).

## II. STANDARD OF REVIEW

Defendants' request for sanctions implicates the Court's authority to police discovery noncompliance under three separate, but overlapping standards. First, as nearly all of the electronic production occurred after Defendants' first Motion to Compel, Rule 37(a) provides a means to reallocate the costs of that compelled production. With regard to a motion to compel discovery specifically, Rule 37(a)(5)(A) of the Federal Rules of Civil Procedure provides:

> If the [discovery] motion is granted--or if the disclosure or requested discovery is provided after the motion was filed--the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees. But the court must not order this payment if:
> > (i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action;
> > (ii) the opposing party's nondisclosure, response, or objection was substantially justified; or
> > (iii) other circumstances make an award of expenses unjust.

The plain language of Rule 37(a) permits monetary sanctions, including fees and reasonable expenses, if the non-disclosure is not substantially justified, and the movant attempts in good faith to resolve the dispute without court action. Fed. R. Civ. P. 37(a)(5)(A).

Second, extensive additional production occurred after the expired deadlines set by the Court's initial orders on the Motion to Compel. As a result, the sanction remedies under Rule 37(b) and (c) apply. The Fourth Circuit has established a four-part test to help decide whether to impose sanctions for discovery violations. The court must determine (1) whether the non-

complying party acted in bad faith, (2) the amount of prejudice that noncompliance caused the adversary, (3) the need for deterrence of the particular sort of non-compliance, and (4) whether less drastic sanctions would have been effective. Belk v. Charlotte-Mecklenburg Bd. Of Educ., 269 F.3d 305, 348 (4th Cir. 2001); Anderson v. Found. for Advancement, Educ. and Emp't of Am. Indians, 155 F.3d 500, 504 (4th Cir. 1998) (citing Wilson v. Volkswagen of Am., Inc., 561 F.2d 494, 505-06 (4th Cir. 1977)). While all four factors are relevant to the Court's exercise of discretion, a finding of bad faith is not a necessary precursor to imposing attorney's fees and costs incurred as a result of a party's failure to comply with discovery. See Southern States Rack and Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 596 (4th Cir. 2003). However, because the information sought is almost entirely electronically stored, the sanctions request is subject to Rule 37(e) which bars sanctions under the Rules for failing to provide information lost "as a result of the routine, good-faith operation of an electronic information system," absent exceptional circumstances. Fed. R. Civ. P. 37(e).

The third standard relates to Defendants' claim of spoliation. Because they also alleged the Plaintiffs destroyed or irretrievably lost relevant evidence, their sanction request implicates the Court's inherent power to remedy spoliation of evidence. Silvestri v. Gen. Motors Corp., 271 F.3d 583, 590 (4th Cir. 2001). In this Circuit, to prove that spoliation of evidence warrants sanction, the party seeking the sanction must show:

    (1)    The party having control over the evidence had an obligation to preserve it when it was destroyed or altered;

    (2)    The destruction or loss was accompanied by a "culpable state of mind;" and

    (3)    The evidence that was destroyed or altered was "relevant" to the claims or defenses of the party that sought the discovery.

Goodman v. Praxair Svcs., Inc., 632 F. Supp. 2d 494, 509 (D. Md. 2009). A party's duty to

9

preserve evidence "arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." Silvestri, 271 F.3d at 591. A party breaches this duty when it fails to act reasonably to preserve material evidence. Victor Stanley, Inc. v. Creative Pipe, Inc., 269 F.R.D. 497, 525 (D. Md. 2010). The right to impose sanctions for spoliation derives from the Court's inherent power to control the judicial process in litigation, but it is limited to that necessary to redress conduct "which abuses the judicial process." Silvestri, 271 F.3d at 590 (quoting Chambers v. NASCO, Inc., 501 U.S. 32, 45-46 (1991)).

The Court's power to remedy spoliation includes a variety of sanctions from dismissal or default judgment to the preclusion of evidence or imposition of an adverse inference. Goodman, 632 F. Supp. 2d at 506. But the harsh sanction of dismissal or default requires a showing of "bad faith" or other "like action" unless the spoliation was so prejudicial that it prevents the non-spoliating party from maintaining his case. Silvestri, 271 F.3d at 593 (quoting Cole v. Keller Indus., Inc., 132 F.3d 1044, 1047 (4th Cir. 1998)). While sanctions for spoliation require some showing of fault, assessments of the level of culpability primarily inform selection of an appropriate sanction, not whether spoliation has occurred in the first instance. EI du Pont deNemours v. Kolon Indus., 803 F. Supp. 2d 469, 498 (E.D. Va. 2011).

### III. ANALYSIS

The Defendants' motion primarily seeks dismissal, the harshest sanction reserved for either severe misconduct or the loss of evidence central to their defense. Indeed, where dismissal is ordered, it usually follows the intentional bad faith destruction of evidence which was central to the issues in dispute. See, e.g., Hosch v. BAE Sys. Info. Solutions, Inc., No. 1:13cv825, 2014 WL 1681694, at *1 (E.D. Va. Apr. 24, 2014) (dismissing employment retaliation case with

prejudice where the plaintiff permanently deleted all data on an iPhone and a Blackberry after a Court Order and two days before turning them over for examination); Taylor v. Mitre Corp., No. 1:11cv1247, 2013 WL 588763, at *1 (E.D. Va. Feb. 13, 2013) (dismissing employment claims where the plaintiff previously smashed a work computer with a sledge hammer and ran specialized programs to delete information on his laptop in direct response to an Order to surrender the laptop). As set forth in greater detail below, no category of Plaintiffs' electronic evidence in this case is so central to the defense that its loss would deprive the Defendants of their ability to defend. Silvestri, 271 F.3d at 583. In addition, Defendants have failed to establish that any Plaintiff deliberately destroyed evidence known to be relevant, or otherwise acted in bad faith. While Plaintiffs' delayed production should not have required Court action, they did eventually produce a nearly complete record of email and social medial posts and these materials were available to Defendants prior to most of the depositions. In addition, the limited relevance of the voluminous material produced suggests that any gaps in production were not likely intentional and do not prejudice Lincoln's defense.

Although the extensive electronic evidence eventually produced demonstrates some inconsistency in individual allegations underlying specific complaints, the conflicts do not fatally, or even substantially undermine any Plaintiffs' claim. Moreover, their impact on any responsible party's credibility may be fully exposed at trial. As a result, viewing the discovery record as a whole, the consistency of the records which were produced supports Plaintiffs' claim that any missing information was likely cumulative, and not lost due to any party's culpable conduct. As a result, Defendants cannot demonstrate either prerequisite for the ultimate sanction of dismissal for spoliation or failure to comply with a Court Order under Rule 37(b) or (c). Silvestri, 271 F.3d at 593; Cole, 132 F.3d at 1047; Hosch, 2014 WL 1681694 at *5.

Nevertheless, nearly all of the electronic production occurred after the motion to compel. The parties' depositions demonstrate they were either initially poorly instructed or deliberately dilatory in their obligations to search for and produce responsive media. Accordingly, despite the marginal relevance of the electronic media which was produced, the costs of insuring a complete production, including the $29,000 fee for the production, will remain with the Plaintiffs. In addition, the Court will award, under Rule 37(a), a portion of the attorney's fees incurred in preparing and arguing the original motion to compel (ECF No. 263), following an opportunity to evaluate the circumstances which affect such an order under Rule 37(a)(5)(A)(iii).

**A.     No sanction is warranted for text messages lost as a result of good faith operation of Plaintiffs' smart phones.**

Although not central to their argument, Defendants contend that sanctions are warranted for Plaintiffs' failure to produce text messages, despite evidence that several of the Plaintiffs communicated by text during the relevant time period. Plaintiffs do not dispute that they have failed to produce text messages, but argue that their text messages would not be relevant to any contested issue, and were irretrievably lost prior to any of them being made aware that they would be specifically sought in discovery. After evaluating the extensive production of other electronic media and under the facts of this case, the Court does not find Plaintiffs' loss of access to their text messages to have been in bad faith. As a result, sanctions for their loss are precluded under Rule 37(e) and not warranted under the Court's inherent authority to remedy spoliation.

Rule 37(e) provides: "Absent exceptional circumstances, a court may not impose sanctions under these rules on a party for failing to provide electronically stored information lost as a result of the routine, good-faith operation of an electronic information system." This subsection was added in 2006 to address "the routine alteration and deletion of information that

attends ordinary use." Fed. R. Civ. P. 37(e) advisory committee note.  Although the advisory committee's notes state that Congress directed the rule at "computer operations," the rule is equally applicable to cell phones, especially smart phones, which run on operating systems similar to computers.  Id.

As discussed below, the storage of text messages, between the cell phone device, the service providers and computer back-up certainly "includes the alteration and overwriting of information, often without the operator's specific direction or awareness."  Id.   Moreover, it is "routine" in that there are default systems in place by carriers and device operating systems that control storage of text messages.  Finally, the complex, automatic, and robust operation of cellular services constitutes an "electronic information system."  See Summary of the Report of the Judicial Conference Committee on Rules of Practice & Proc. 168 (Sept. 20, 2005), http://www.uscourts.gov/uscourts/RulesAndPolicies/rules/Reports/ST09-2005.pdf    (describing "electronic information systems" as programs that involve: recycling storage media kept for brief periods; automatically overwriting information that has been "deleted"; automatically discarding information "that has not been accessed within a defined period or that exists beyond a defined period without an affirmative effort to store it for a longer period").

Because Rule 37(e) governs Plaintiffs' failure to produce text messages, the issue is whether Plaintiffs' inability to produce those messages occurred "as a result of the routine, good-faith operation of an electronic information system."  Fed. R. Evid. 37(e).  Based on the normal operation of cell phones and service providers, the Court finds that Plaintiffs' failure in this case, resulted from the routine, good-faith operation of their phones, and therefore, Rule 37(e) precludes sanctions under the Federal Rules.

It bears mention again that Plaintiffs' allegations involve claims arising from mold and mold damage in their former homes and the Defendants' alleged failure to remediate that mold. The timing and frequency of texts sent or received by any Plaintiff would have no relevance to these issues. It is possible that a Plaintiff may have sent a text – the content of which would be relevant, but only if the message related to the time they were residing in the home. As a result, under the facts of this case, no Plaintiff was on notice of an obligation to preserve such texts when their affirmative efforts could have prevented loss of the messages.

Unless the individual plaintiffs intentionally backed up their text messages to their computer or a cloud-based service, then the content of their messages would only be stored on their devices. Among major carriers Verizon, T-Mobile, Sprint, and AT&T, only Verizon retains text message content. Retention Periods of Major Cellular Service Providers, U.S. Dep't of Justice, Computer Crime and Intellectual Property Section (August 2010), available at http://www.pcmag.com/image_popup/0,1740,iid=313504,00.asp. However, Verizon only keeps that information for three to five days.[6] Id. Additionally, storage on the device varies by device. See Text Messaging FAQs, Verizon Wireless, http://www.verizonwireless.com/support/text-messaging-faqs/. The Court has no evidence before it on the text messaging applications on the various phones that Plaintiffs may have used.[7]

---

[6] In contrast, Verizon retains call and text detail records (not content) for one year. T-Mobile keeps the same information for five years, AT&T for five to seven years, and Sprint for eighteen to twenty-four months. See supra, DOJ Information.

[7] However, some research indicates that if a user frequently sends and receives text messages, then the device's storage space will be filled more quickly, and the older messages will be lost more quickly because most devices automatically delete older messages in order to make room for new ones or prompt the user to delete old messages. See Thomas McNish, How Long Does an iPhone Store a Deleted SMS?, eHow (last visited Decl. 10, 2014), http://www.ehow.com/info_12168930_long-iphone-store-deleted-sms.html; see also U.S. Legal Support, Inc. v. Hofioni, No. 2:13-CV-1770, 2014 WL 172336, at *4 (E.D. Cal. Jan. 15, 2014) (summarizing expert testimony on same). Service providers often recommend that users delete old messages to maximize a phone's efficiency and performance. See Dep. of Nicole Harding, Tr. at 245-46 (ECF No. 373-14, at 5-6) ("My phone won't run if there are text messages taking up the data. That's what they told me at the Sprint store."); supra, Text Messaging FAQs, Verizon

Based on the record here, Defendants have not shown that Plaintiffs acted in bad faith by failing to preserve text messages during a time when their preservation was feasible. Rather, Plaintiffs' failure to produce any text messages from the time they lived in the subject housing resulted from either the routine operation of their phones' service provider or their routine good-faith maintenance of their phones. Plaintiffs were already examined on their efforts to obtain text messages. E.g., Dep. of Nicole Harding, Tr. at 246 (ECF No. 373-14, at 6); Letter of Abbee Brandsema (ECF No. 310-2, at 40) ("I have contacted Verizon Wireless and been informed with no uncertainty that text messages cannot be reproduced after they have been deleted."); Letter of Monica Chan (ECF No. 310-2, at 23) (describing her efforts to obtain lost text messages); Dep. of Heather Coleman, Tr. at 214 (ECF No. 373-13, at 5) (expressing her lack of awareness of a need to manually preserve electronic information including text messages); Letter of Rachel Delorey, July 13, 2014, at 3 ("I have contacted Verizon . . . and asked for print outs of text messages to and from specific persons that I thought I may have had conversations with."); Letter of Shelley Federico, July 14, 2014, at 3 (stating that she called Verizon Wireless and followed-up in a local Verizon store). Moreover, the fact that Plaintiffs are individuals whose devices are solely for personal use informs what constitutes a "routine, good-faith operation." Fed. R. Civ. P. 37(e). E.g., Painter v. Atwood, No. 2:12cv1215, 2014 WL 1089694, at *6-7 (D. Nev. Mar. 18, 2014) (holding that the movant failed to show that an individual plaintiff and her co-worker should have been on notice that they needed to save text messages before litigation). Cf. Nucor Corp. v. Bell, 251 F.R.D. 191, 199 (D. S.C. 2008) (holding corporate party liable for spoliation by continuing to use a laptop when it was under a duty to preserve the data on its hard drive).

---

Wireless ("Once your inbox is full, you won't be able to receive new messages until you delete old messages to create additional space.").

The Defendants' reply brief goes to some length to establish that certain Plaintiffs anticipated litigation long before suit was filed. But anticipating litigation only gives rise to a duty to preserve what the party knows will be relevant evidence. As one district court characterized it:

> While a litigant is under no duty to keep or retain every document in its possession once a complaint is filed, it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request.

Wm. T. Thompson Co. v. General Nutrition Corp., 593 F. Supp. 1443, 1455 (C.D. Cal. 1984) (citations omitted). That is, the duty to preserve does not arise until the party in possession of the evidence has notice of its relevance. See Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 72 (S.D.N.Y. 1991). Indeed, several Plaintiffs were examined on their preservation efforts and testified to preserving files and other papers associated with the mold issue.

The Court has no evidence before it to demonstrate how long, if at all, Plaintiffs' various devices store text message information. Because of the normal operation of cell phone messaging systems and the fleeting nature of text messages, Plaintiffs likely would have needed to take affirmative steps to produce their text messages in a different format on a different platform in order to "preserve" their content. Although the steps may have not been burdensome to Plaintiffs, there is no evidence that any Plaintiff even sent a relevant, non-privileged text message, much less that all Plaintiffs should have been on notice of an obligation to preserve their texts at a time when their actions would have preserved anything that may have been relevant. Accord Painter, 2014 WL 1089694, at *6-7 (Individual plaintiff "was not on notice to preserve the deleted texts at the time she deleted them."). To hold otherwise would require these

individual Plaintiffs to understand, prior to receiving any discovery requests, and in some cases prior to ever conferring with counsel, that their voluminous daily text message content could relate to a claim or defense in future litigation regarding their landlord's response to complaints about mold. At most, the few tangential references to texting in the other electronic media suggest the Plaintiffs may have texted each other, or third parties. Lincoln has produced no text messages of its own from any Plaintiff. This suggests either that the Plaintiffs did not communicate with Lincoln by text, or that Lincoln officials with whom they did communicate did not preserve the received texts.

The loss of Plaintiffs' text messages in this case was the result of the routine, good-faith operation of their phones. Because Defendants have not presented any "exceptional circumstances" with respect to the loss of text messages, Rule 37(e) precludes sanctions against Plaintiffs for their inability to produce text messages under the Federal Rules of Civil Procedure. Rule 37(e) does not affect sanctions based on the court's inherent power because it only bars sanctions for lost electronically stored information "under [the Federal] rules." Fed. R. Civ. P. 37(e); see id. advisory committee note to the 2006 amendment; Nucor Corp. v. Bell, 251 F.R.D. 191, 196 n.3 (D. S.C. 2008). However, the court's inherent spoliation power "is limited to that necessary to redress conduct 'which abuses the judicial process.'" Silvestri, 271 F.3d at 590 (quoting Chambers v. NASCO, Inc., 501 U.S. 32, 45-46 (1991)). Here, because Plaintiffs did not have a duty to take the steps necessary to preserve text message content at a time when any relevant content could have been preserved, the Court finds that Defendants have not established the elements of spoliation and therefore, sanctions are not warranted.[8]

---

[8]Because the Court finds that Defendants have failed to prove the first element required for imposing spoliation sanctions, the Court need not address the latter two elements: culpable state of mind and relevance. See Cytec Carbon Fibers, LLC v. Hopkins, No. 2:11cv217, 2012 WL 6044778, at *2-3 (D. S.C. 2012). Nevertheless, it is clear that Plaintiffs committed no willful destruction of relevant evidence.

**B.    Plaintiffs' nearly complete production of emails does not warrant sanction, given the volume of materials which were produced and their marginal relevance.**

Defendants also seek sanctions against Plaintiffs for their failures in e-mail production. In their original sanctions motion filed on July 31, 2014, Defendants sought sanctions for Plaintiffs' "failure to comply with the Court's June 4, July 10 and July 17 Orders and other discovery violations." Defs.' Br. (ECF No. 310, at 17).   Thereafter, Plaintiffs produced some additional electronic information, most notably a comprehensive September 3, 2014 production of Facebook records.   In addition to Plaintiffs' general tardiness in producing e-mails, Defendants now point to two specific e-mail accounts that either were not originally disclosed at all or that Plaintiffs have allegedly failed to review for responsive e-mails.[9]   They also point to instances of email production by one party of an email copied to, but not produced by another, as evidence that certain Plaintiffs have failed to produce sufficient email. Plaintiffs respond generally that, with the exception of one account of George Sulligan's, no relevant e-mails remain undisclosed or were spoliated. See Pls.' Supp. Br. (ECF No. 389, at 5).  As of September 26, 2014, Plaintiffs had produced 1,330 e-mails.  (Decl. of Laurie Dowling-McIntire Att. 1 (ECF No. 369-1, at 17)).

---

And, although Defendants may have recovered impeachment evidence or contributory negligence evidence, the relevance of lost text messages appears marginal particularly in light of the extensive production from email and social media. See, e.g., U.S. Legal Support, Inc. v. Hofioni, No. 2:13-CV-1770, 2014 WL 172336, at *4 (E.D. Cal. Jan. 15, 2014) (holding that the movant had failed to offer enough evidence for the court to conclude that relevant evidence had in fact been spoliated).

[9] In their Supplemental Brief (ECF No. 373), Defendants argue about a third e-mail account: meagan.sulligan@gmail.com.  The September 3, 2014 Facebook production showed that Ms. Sulligan updated her status on Facebook on January 10, 2012 with: "Add me on google + meagan.sulligan@gmail.com to stay up to date on our fight against Lincoln!" (ECF No. 373-6, at 55). Defendants initially stated that this account was never disclosed to them or to the Court, but then in their Reply, Defendants concede that they were mistaken. Ms. Sulligan did disclose this account. Defs.' Reply (ECF No. 392, at 5 n.5).  Thus, the undersigned will not consider this account as part of Defendants' argument for sanctions.

First, Defendants express particular concern about an email account titled militarymoldwarriors@gmail.com. This was an account created by Plaintiff Meagan Sulligan, and shared with Plaintiff Nichole Harding on March 17, 2012. It was not disclosed by either in response to interrogatories, but discovered by Defendants in their review of Plaintiffs' September 3, 2014 Facebook production. Decl. of Connie Bertram ¶ 4 (ECF No. 373-4, at 2). Defendants now claim that their "inspection of that account leads them to believe that emails and/or metadata in that account may have been spoliated." Defs.' Supp. Br. (ECF No. 373, at 13). In response to Defendants' inquiry about the account, Ms. Sulligan declared, "I do not remember setting up the account, why the account was set up, or any other circumstances surrounding the account." Decl. of Meagan Sulligan ¶ 3 (ECF No. 373-5, at 6).

On March 17, 2012, Ms. Sulligan sent the email address and password for the militarymoldwarriors email account to Ms. Harding. Ms. Harding also has no specific memory of using the account and declared that she "can only speculate as to the purpose of the account." Decl. of Nichole Harding ¶ 4 (ECF No. 373-5, at 16). Plaintiffs' counsel's review of the account showed it to be unused. E-mail from Tammy Belinsky to Connie Bertram (Sept. 24, 2014, 10:02 AM), (ECF No. 373-5, at 21). Defendants were permitted access to the account and their computer forensics expert reviewed it and found seven e-mails in the inbox. Decl. of Christopher Racich ¶ 5 (ECF No. 392-4, at 2). Four had been received in the account on September 25, 2014 in relation to the password reset used to access the account. The other three were received on March 17, 2012 from the "Gmail Team" with tips and settings information about setting up the account. Id. Ex. B (ECF No. 392-4, at 6-9). All other folders in the account were empty. Id. ¶ 6. Contrary to defense counsel's assertion, the forensic expert offered no opinion on possible spoliation of messages or metadata. He only stated that "[b]ecause Plaintiffs

and/or their counsel logged into the militarymoldwarriors Gmail account on September 25, 2014 to change the password and then the recovery email address, [he] was not able to determine the last time the account was accessed prior to that day." Id. ¶ 7.

The second e-mail address Defendants take issue with is jrsywild@gmail.com. This account belonged to Plaintiff George Sulligan since 2010. Mr. Sulligan reported that he could not remember the password to this account and has unsuccessfully tried to recover the password. Decl. of George Sulligan ¶¶ 8-10 (ECF No. 373-6, at 52-53). He asserts that when he calls "telephone numbers for Google, no one answers the telephone. I have never been able to find an email address for Google or Gmail support." Id. ¶ 10 (ECF No. 373-6, at 53). Mr. Sulligan admits that he used the account to communicate with Defendants while the Sulligans resided in their home. Id. ¶ 12 (ECF No. 373-6, at 53). Plaintiffs' counsel also concede that this account may contain relevant e-mail. Pls.' Supp. Br. (ECF No. 389, at 3) ("[T]he only Plaintiff who has relevant email that has not been produced from his own account is unable to access his email account."). They also point out that Lincoln has in fact produced copies of the e-mails between itself and jrsywild@gmail.com. Pls.' Supp. Br (ECF No. 389, at 16). "Some [] third-parties" have also produced e-mails exchanged with this account. Id.

Before analyzing the email production, the Court reiterates that Plaintiffs are individuals, whose claims involve the Defendants' alleged failure to maintain their military-provided housing. They did not use any centralized email facility, rather each had an account (or multiple accounts) with consumer-oriented free email services such as Yahoo, Gmail and Hotmail. (Decl. of Laurie Dowling-McIntire, ECF No. 369-1, at 5). While the individual Plaintiffs resided in the homes, the properties were managed by Lincoln under a long-term lease with the military. It was Lincoln's obligation to respond to residents' complaints and to arrange appropriate repairs. As a

result, the Plaintiffs' allegations of liability, which relate to Lincoln's alleged failure to perform these duties, will largely turn on evidence already in Lincoln's possession. However, certain Plaintiffs separately engaged various cleaning or remediation contractors. In addition, admissions regarding the condition of their home, the severity of the mold or other problems, and the scheduling or completion of repairs might be contained in relevant emails directed to parties other than the named Defendants. As a result, the Court did order production of relevant emails, but these third party emails would be substantially less probative on the liability issues scheduled to be tried in April.

Notwithstanding these circumstances, and the Plaintiffs' collective production of over 1,300 emails from dozens of different accounts, Defendants argue that the deficiencies in their production warrant severe sanctions. Reiterating their original arguments for sanctions, Defendants assert that "information uncovered since the August 20 hearing has shown that Plaintiffs' noncompliance is even more wide-ranging than Defendants were previously aware." Defs.' Supp. Br. (ECF No. 373, at 12). Defendants argue that Plaintiffs' deficiencies "demonstrate more than mere negligence; they demonstrate Plaintiffs' bad faith attempt to evade their obligation to comply with this Court's Orders." Defs.' Br. (ECF No. 310, at 19). The Court does not agree.

With regard to the two accounts specifically addressed in Defendants' motion, the Court does not find any failure to produce email content warrants sanctions. The unused account named militarymoldwarriors@gmail.com contained no responsive email. This is established by the declarations of Ms. Sulligan and Ms. Harding and the Defendants' forensic examiner Mr. Racich. When discovered, the reopened account contained only the original emails from Google to arrange the account set up, as well as additional emails related to the password reset in

September, 2014.  While the Defendants speculate that the account may have been used in the interim and other emails deleted, they have identified no evidence supporting this claim or refuting the multiple sworn statements which oppose it.  Contrary to their argument, Defendants' own forensic examiner did not state or imply that evidence was spoliated.  He only stated that the password reset (undertaken as a result of a Plaintiff's inability to recall creating the account) prevented him from identifying when the account had earlier been accessed.  Given that the Plaintiffs' had no memory of the account, which was located on a third party server, accessing it would be a necessary step to locating responsive, non-privileged email.  In fact, a sworn declaration by Plaintiffs' paralegal established that after she reset the password, the original 2012 emails related to the setup of the account had never been opened, and the only other emails in the account related to the 2014 original password reset.  (Dowling-McIntire Decl., ECF No. 369-1, at 7).  This hardly constitutes evidence that emails or other data had been deliberately or even negligently destroyed.  In addition, the Defendants have not identified a single email originating from this account.  Given the volume of electronic media already produced,[10] this is more than sufficient evidence to corroborate the Plaintiffs' position that the militarymoldwarriors account went unused after it was created despite its suggestive title.

With regard to Mr. Sulligan's account titled jrsywild@gmail.com, the Plaintiffs concede both that it may contain responsive email and they have been unable to produce them.  Defendants mischaracterize this admission in their brief, writing that Mr. Sulligan "had not reviewed his account . . . for responsive emails, even though he admits he 'used the account to communicate' with Defendants." (ECF No. 373, at 13).  While it is true that Mr. Sulligan "had not reviewed" the account, his detailed affidavit opposing Defendants' motion describes his

---

[10] Plaintiff Nicole Harding produced 315 emails, and Plaintiff Maegan Sulligan produced 365 emails. (Summary of Electronic Production, ECF No. 369-1, at 17).

inability to gain access to the account, which is maintained on a Google server, and which he stopped using in 2012 as a result of a change in his cell phone provider. (Sulligan Decl., ECF No. 369-2, at 18-20). The same declaration authorizes the Defendant to obtain access to his email content directly, subject to the terms of a previously entered Protective Order. Id.; see also Electronic Communications Privacy Act, 18 U.S.C. § 2702(b)(3) (authorizing release of content by remote computer service provider with consent of subscriber); In re Subpoena Duces Tecum to AOL, LLC, 550 F. Supp. 2d 606, 609-12 (E.D. Va. 2008) (discussing the interplay of Rule 45 and 18 U.S.C. § 2702(b)). The Defendants did not respond to this suggestion, but it appears they have not undertaken their own subpoena or other direct inquiry to Google despite the Sulligans' permission.

After reviewing Mr. Sulligan's declaration, and the other email already produced, the Court does not find that his inability to produce email from this particular account warrants sanction. As set forth in detail elsewhere, the electronic evidence available from the Plaintiffs' personal accounts is not the most probative evidence of liability. To the extent any such evidence was contained in this account, Mr. Sulligan attests that it would have included emails directly from him to officials at Lincoln. Indeed, Lincoln acknowledges that other emails from the jrsywild account have already been discovered. Mr. Sulligan has affirmatively stated that he did not delete the account, and has invested considerable time in trying to comply with the Court's prior Order notwithstanding the limited relevance of any additional material believed to be in the account. Under these circumstances, and given the cumulative nature of any material likely to be found, the Defendants' ability to separately subpoena Mr. Sulligan's account subject to the terms of the Protective Order is an adequate remedy.[11]

---

[11] Both Mr. Sulligan and Plaintiffs' paralegal, Ms. Dowling-McIntire, testified to their efforts to recover a password and gain access to the account. Because the account was connected to a cell phone through a

Finally, in contrast to those cases where sanctions have been imposed for the loss of electronic messages, Plaintiffs here did not act in bad faith or intentionally delete email to avoid their discovery. Cf. Southeastern Mechanical Services, Inc. v. Brody, 657 F. Supp. 2d 1293, 1300-01 (M.D. Fl. 2009) (imposing sanctions after finding that individuals intentionally wiped data from their business-related Blackberries in trade secrets case). Based on the sliding scale that weighs relevance of the lost evidence and culpability, Plaintiffs must have acted in bad faith to warrant an adverse jury instruction, or an even more severe sanction. See, e.g., E.I. du Pont de Nemours, 803 F. Supp. 2d at 498 ("Assessing the quantum of fault becomes appropriate when determining the appropriate sanction, not in deciding whether spoliation has taken place."); Bashir v. Amtrak, 119 F.3d 929, 931 (11th Cir. 1997) (requiring bad faith for an adverse inference). The Defendants' evidence does not establish that they did so. Accordingly, the Court will not award sanctions for failing to produce additional email.

C.    **Plaintiffs' Facebook production, though delayed, does not demonstrate bad faith or prejudice sufficient to warrant severe sanctions.**

The bulk of Defendants' briefing is devoted to argument regarding the insufficiency of Plaintiffs' production of social media posts, particularly from Facebook. This dispute originated even before the lawsuit when Defendants discovered that several of the Plaintiffs were prolific posters on Facebook. Not only were several of the Plaintiffs' Facebook profiles public, but certain Plaintiffs created and/or posted to special interest pages, including "Families Affected by Military Housing Mold," "the Truth About Lincoln Military Housing in Hampton Roads," and "Victims of Toxic Mold." (ECF No. 373, at 10). As a result, Defendants were justifiably troubled by Plaintiffs' initial production which included no Facebook posts at all.

---

provider Mr. Sulligan no longer uses, account recovery from this non-party (Google) may not be "reasonably accessible." Fed. R. Civ. P. 26(b)(2)(B). (Dowling-McIntire Decl. ECF 369-1, at 7).

After engaging expert assistance, however, Plaintiffs eventually produced 5,527 Facebook records, including records from every Plaintiff with a Facebook account. (Decl. of Jordan McCabe, ECF No. 389-1, at 3). These records were identified by search terms provided by Defendants (Bertram Decl., Ex. C, ECF No. 285-1, at 9-11) and were produced directly to the Defendants without preliminary review by Plaintiffs' counsel subject to the terms of an Agreed Protective Order. (ECF No. 357). At present, the Plaintiffs have incurred the fees for retaining expert assistance, retrieving, and producing the material.

The Defendants argue these records are "highly relevant" and demonstrate both the necessity of their vigorous motions practice, and the likelihood that additional relevant records have been lost or destroyed. (ECF No. 373, at 4). Plaintiffs concede the discoverability of the material, but argue its relevance is minimal, and that it is largely, if not entirely, cumulative of other evidence already produced. After reviewing the Defendants' argument, including approximately 200 separately numbered Facebook posts attached as exhibits to the sanctions motion, the Court agrees with the Plaintiffs. While the 200 selected records demonstrate some relevance, and thus confirm Plaintiffs' obligation to produce them in response to Defendants' discovery requests, the posts almost uniformly support the Plaintiffs' claims. In this sense, while discoverable, the vast majority of the Facebook records produced are cumulative of other discovery in the case, and less probative than other evidence on the liability issues which are set for resolution in April. In addition, while some small gaps in the Facebook production may remain, the overwhelming consistency in the hundreds of records which were submitted to the Court for review does not suggest any bad faith or the loss of evidence in the few materials which may have been omitted.[12] Accordingly, as explained in greater detail below, the Court

---

[12] In particular, the Defendants observe that both the Brandsemas and Sulligans testified to deleting some material from their Facebook accounts. (ECF No. 392, at 7). The Plaintiffs responded that the changes to

does not find the production warrants sanction under Rule 37(b) or (c), nor do any small gaps in production warrant relief for spoliation.

The Defendants' supplemental brief and accompanying exhibits attempt to show the relevance of the Facebook production in three general areas. Defendants argue that the records are relevant to show 1) the condition of the Plaintiffs' homes during the time of their tenancy, 2) the deficiencies in Plaintiffs' production of other records, and 3) the Plaintiffs' motivation for suit, or demonstrations of ill-will against Lincoln. See (ECF No. 373-2) (Defendants' chart summarizing selected Facebook posts)). In each of these three areas, the Defendants have overstated the importance of the Plaintiffs' individual use of social media to the liability issues to be contested.

### i. Condition of the home.

Several Facebook posts have been identified by the Defendants as relevant because they demonstrate the condition of the Plaintiffs' home during the time of their tenancy. Indeed, the possibility of photographic or video evidence demonstrating the condition of any Plaintiff's subject residence was a strong motivation to require complete production of the Facebook records. After reviewing the materials selected by the Defendants to support their motion, however, the undersigned finds that the posts do little to shed light on relevant conditions in any of the family homes.

Most of the posts identified in this category either relate specifically to a Plaintiff's complaint of mold damage, e.g., (ECF No. 373-5, at 41, 44; ECF No. 373-6, at 8, 11) or depict unaffected areas of the home as background for photos or descriptions of routine family life.

the accounts related to private marital communications unrelated to these claims. While the Court does not condone the parties' deletion, the volume of material which was produced by both families, and the manner in which it was reviewed and produced belies any suggestion that they intended to deprive Lincoln of relevant evidence. See (ECF No. 369-1, summarizing Facebook production by party).

E.g., (ECF No. 373-5, at 199, 202, 205, 214). To the extent any of the photographs demonstrate mold damage, they appear to be entirely cumulative of other photographs already produced or already in Lincoln's possession. The other photos or descriptions of the residences do not document any particular defect but mostly show family situations with the home as backdrop. Thus, while these posts do depict "the condition of the home," they are not particularly germane to the contested issues, which involve allegations of mold in carpet, HVAC equipment, ductwork, behind walls and under flooring. E.g., Chan Complaint, ¶¶ 17-25, case no. 2:12cv580, (ECF No. 1, at 12-14) (alleging moisture and mold in the HVAC unit, HVAC closet and duct work). As a result, photos showing an apparently undamaged ceiling are not particularly useful to establish or refute a fact at issue. E.g., (ECF No. 373-2, at 2) (Ms. Chan posting "napkin dipped in pop and thrown on my ceiling . . . this is what my kids do when I'm in the bathroom.").[13] Other posts merely describe activities in the house which appear to bear no relation whatsoever to the allegations in any Complaint. E.g., (ECF No. 373-2, at 35) (Ms. Sulligan posting "Anyone know how to fix a dryer? It would break once I FINALLY got it upstairs. ☺"); (ECF No. 373-2, at 27) (Ms. Harding posting "so apparently these Navy toilets aren't as bad as I thought. [My daughter] just flushed her underwear down them and it didn't even get backed up."). Far more relevant than these innocuous depictions of family life are pictures and descriptions of black mold in vents, (ECF No. 373-11, at 86), under floors, (ECF No. 373-11, at 59), and behind walls, (ECF No. 373-6, at 8). These mold-related posts are clearly relevant and discoverable, but they are also almost entirely cumulative of other discovery (as the Plaintiffs all along maintained they would be). As a result, the already incurred cost of

---

[13] Lincoln's attorneys suggested Ms. Chan's self-deprecating post regarding her children throwing pop-soaked napkins on the ceiling was also relevant to support the Defendants' claim of contributory negligence due to her poor housekeeping. This suggestion reveals a level of inexperience supervising small children, as well as the minimal relevance of the records counsel selected to support the motion.

producing them must be considered under the proportionality mandate of Federal Rule 26(b)(2)(B) and (C).

      ii.    **Deficiencies in other discovery.**

A number of the selected Facebook posts are identified by Defendants as demonstrating deficiencies in the Plaintiffs' prior production. In some cases this is because a photo or image was produced in the Facebook production which had not been produced in prior discovery. E.g., (Bertram Decl., Ex. 26, ECF No. 373-5, at 202; Bertram Decl., Ex. 37, ECF No. 373-6, at 20). In most cases, however, the allegedly omitted image is completely irrelevant and was only produced in the Facebook production due to the extremely broad nature of the search terms and the Plaintiffs' agreement to disclose every record produced by the search.

For example, the image in Bertram Exhibit 26 was a post by Mr. Chan, described in the Defendants' motion for sanctions as "a picture of his wife and daughter that appears to show their home." This exhibit was identified by the Defendants among the 5,000 records produced to them as demonstrating deficiencies in the Chans' prior production because they had not previously produced the photograph. (ECF No. 373-2, at 9). Indeed, the picture does narrowly depict the Chan's home as background, but it is captioned "My girls' new haircuts." It does not depict any mold damage, but neither does it refute the Chans' claims. It is a photograph of Mr. Chan's family and their faces fill the bulk of the image. In short, it is irrelevant, was needlessly produced, and appeared in the production from the Facebook vendor only because it contained the name of a consolidated Plaintiff, Heather Coleman who "liked" it. Several other posts identified in this category are similarly irrelevant. E.g., (Bertram Decl., Ex. 69, ECF No. 373-8, at 84 (depicting the Chan children in their playroom); Bertram Decl., Ex. 197, ECF No. 373-11, at 23 (depicting the Sulligans' kitchen).

Other posts are identified as demonstrating the deficiencies involved posts between Plaintiffs which had been produced by only one. (ECF No. 373-2, at 31) (citing Bertram Decl., Ex. 183, ECF No. 373-10, at 158). As set out by Plaintiffs' forensic expert, there are a variety of reasons why posts might appear in one place and not in another, including specifically where a user comments on another's post. The comment is not recorded on the Facebook data of the original commenter. (McCabe Decl., ECF No. 389-1, at 94-95).

Ultimately, however, whether any of these deficiencies are sanctionable must be assessed through the four factors outlined in Anderson v. Found. for Advancement, Educ. And Emp't of American Indians, 155 F.3d 500, 504 (4th Cir. 1998). The court must determine: (1) whether the non-complying party acted in bad faith, (2) the amount of prejudice that noncompliance caused the adversary, (3) the need for deterrence of the particular sort of non-compliance, and (4) whether less drastic sanctions would have been effective. Id. (citing Wilson v. Volkswagen of Am., Inc., 561 F.2d 494, 503–05 (4th Cir. 1977)). If Defendants came into possession of a document or image they believe was discoverable, it certainly mitigates any prejudice that Defendants may have suffered. Thus, even assuming that either of these scenarios presents a deficient discovery production, the lack of prejudice steers the Court away from imposing sanctions. Defendants have argued that such a deficiency should lead to the inference that more undisclosed, relevant information remains outstanding, but the undersigned is not inclined to draw that inference based on the course of discovery in this case. As set forth elsewhere, the Defendants provided over 5,000 social media posts from 16 different accounts. That production was obtained through a retained forensic consultant who produced records directly to the requesting party. Moreover, the belatedness of any production was already mitigated after the trial on liability was continued, and the Court extended the discovery cutoffs. Compare Original

Rule 16(b) Scheduling Order (ECF No. 209), with Minute Entry for Aug. 5, 2014 (ECF No. 315). Finally, the vast majority of posts in this category are irrelevant, and were produced solely because they were selected in the protocol devised by the Defendants to obtain the broadest possible response.

### iii. Motivation for suit or ill-will against Lincoln.

By far, the largest number of selected posts described in Defendants' motion are relevant to the Defendants' contention that Plaintiffs' bear ill-will or animosity toward Lincoln as evidenced by their public posts condemning the company and its response to their Complaint. Were that issue in dispute, the treasure trove of electronic evidence obtained through Facebook certainly answers the question definitively. But the Plaintiffs have not made a secret of their ill-will towards Lincoln, which is amply documented in other evidence, videotapes, news reports, email and correspondence. The identified Facebook posts, intended for a sympathetic audience, merely amplify any particular Plaintiff's previously demonstrated unhappiness – sometimes through the use of more colorful language – but shed little new light on this established fact. Most importantly, they do not suggest that additional relevant evidence has been lost.

The foregoing analysis is not intended to minimize Defendants' contentions regarding the relevance and discoverability of some of this material. However, in fashioning sanctions for Plaintiffs' alleged noncompliance under the Rules, the Court must consider the nature of the evidence in relation to other discovery. In that regard, it does not appear that the Plaintiffs' failure to comply with the Court's Order has deprived Defendants of significant relevant evidence. To the extent that Defendants have been deprived of any evidence, it was not as a result of any Plaintiff's deliberate act. Indeed, it does not appear that any loss of relevant data resulted from deletion, only from a possible failure to take affirmative steps to preserve data or

access to data. In fact, of the more than 5,000 Facebook records produced, and the more than 200 submitted to the Court in support of Defendants' argument, less than a handful contain relevant, <u>noncumulative</u> evidence of whether a mold condition did or did not exist, or whether Lincoln did or did not properly remediate after notice of such a claim. At most, these posts bear on the related issue of whether other factors were involved. <u>E.g.</u>, (ECF No. 373-2, at 34) (the Sulligans posting about having to clean up cat urine); (ECF No. 373-2, at 12) (the Coleman's posting about a plumbing problem); or whether property already damaged by mold could be cleaned. <u>E.g.</u>, (ECF 373-11, at 14) (the Hardings posting about personal property cleaned with a mold decontaminate). But these relevant posts have now been produced, and in most cases were available to the Defendants before depositions.

While the Defendants' rightly fault Plaintiffs' for their admittedly lackluster initial production, the Court does not find their efforts demonstrate bad faith, or even any lesser standard of culpability necessary to impose sanctions. Indeed, if any data was lost as a result of the delay, the loss was minimal, and likely incidental to automatic deletion or some other unrelated change in the parties' use of media. It does not follow that any person intentionally, or even negligently failed to preserve evidence they knew to be relevant. Instead, where electronic data is concerned, "the more logical inference is that the party was disorganized, or distracted, or technically challenged, or over-extended," or all of these. <u>In re Ethicon, Inc. Pelvic Repair Systems Prod. Liab. Litig.</u>, 299 F.R.D. 502, 518 (S.D. W.Va. 2014).

**D.      Proportionality requirements of Rule 26(b)(2)(C) require the Court to consider costs to the Plaintiff in evaluating any sanction under Rule 37(b) or (c).**

In their several briefs since the Facebook production, the Defendants have highlighted a post made by Ms. Federico on the date contractors opened the wall of her Lincoln-managed

apartment on October 13, 2011.   When workers discovered black mold on the back of the

drywall, Ms. Federico posted a picture of the mold on Facebook, commenting "black mold in the

walls! Gotta love base housing." (ECF No. 373-2, at 16).   Later in the same post, Ms. Federico

responded to a friend's inquiry on her timeline for repairs by posting "um, yeah, about that . . .

Duces [sic][14] I'm moving out!").   Defendants argue this post undermines Ms. Federico's

complaint in which she alleged that when her wall was opened up she became ill with severe

headaches, dizziness, and "projectile vomiting." Id. (citing Federico Complaint).

The Plaintiffs see no inconsistency.   They point out that the photographs in the post had

previously been produced.   With regard to Ms. Federico's comments, they argue that her

Complaint did not disclose the exact timeline of her illness and that interrogatory answers later

clarified the timing in a way not inconsistent with her posts.   (Federico Interrog. Resp., ECF No.

389-1, at 14).   In response to this contention, Defendants cite several other references from

discovery during which Ms. Federico variously describes the timing of her illness.   (ECF No.

392, at 13, (citing both Ms. Federico's medical records and previous statement to WTKR

reporter Lori Simmons)).

The foregoing exchange, which the parties even more elaborately briefed, illustrates the

difficulty the Court will inevitably face in trying to achieve the proportionality required by Rule

26(b)(2)(C) in electronic discovery of social media.   The Defendants correctly note that this post

is potentially relevant to Ms. Federico's credibility.   To the extent she made prior statements

suggesting she was "immediately" incapacitated or being exposed to the mold, her ability to post

what defense counsel describes as "sassy" descriptions of the circumstances may undermine her

credibility.   But having already produced the photographs and other documents related to the

---

[14] Defendants' brief relies upon the internet's Urban Dictionary for the meaning of "duces" which they contend means: "saying bye' originates from putting up two fingers 'I'm bout to hit it duces." (ECF No. 373-2, at 17, citing www.urbandictionary.com\define.php?term=duces).

work being performed, it is difficult for the Plaintiff or her attorney to understand in advance how describing these already disclosed facts in a Facebook post might have independent significance. This is especially so where, as here, the parties do not agree on the existence of any previous inconsistency in her description.

This potential problem can be mitigated when a thorough self-directed search allows the Court to evaluate some documents for relevance before ordering a forensic exam. But when, as in this case, significant costs have already been incurred in producing this material, the allocation of those costs under Rule 37 is the only tool left for the Court to try and ensure proportionality. Thus, in evaluating whether to award sanctions under Rule 37(b) or (c) even if the Court were to determine that the Plaintiffs had acted culpably, by failing to produce social media in a timely fashion, the cumulative nature of the material and its subsequent production has significantly limited, if not eliminated, any prejudice to the Defendants. See Belk, 269 F.3d at 348. Moreover, the expense Plaintiffs already incurred must be evaluated in light of the proportionality limits of Rule 26(b)(2)(C), and Rule 37(e)'s caveat precluding sanctions for electronic information lost due to good faith operation of the electronic information system. Having considered all of this, the Court finds that the $29,000 Plaintiffs already incurred to generate the additional material is a sufficient sanction to deter further non-compliance. In combination with the extended discovery deadlines permitting depositions after the material was produced this is a sufficient remedy for any non-compliance with the Court's prior Orders related to production of electronic media.

E.     **The circumstances of the parties' discovery dispute require an award of costs or attorney's fees associated with the Defendants' Motion to Compel under Rule 37(a).**

The Plaintiffs have incurred, and by this Order will bear, the expense of the forensic

examination and production of their electronic media totaling over $29,000. The foregoing pages explain the Court's decision not award any further sanction as a result of Plaintiffs' largely complete, but admittedly dilatory discovery response. However, even in cases where the non-complying party does not act in bad faith, Rule 37(a) mandates an award of attorney's fees and costs associated with a motion to compel where discoverable material is produced after the motion, and the non-producing parties conduct was not substantially justified, unless other circumstances make an award of expenses unjust. Fed. R. Civ. P. 37(a)(5)(A). Here, there is no dispute that a large amount of discoverable material was produced after the Defendants filed the motion. Prior to filing, the Defendants certified, and the Court finds, that they attempted to resolve Plaintiffs' non-compliance and were unsuccessful.

Although the Court has found that Defendants failed to establish the level of culpable conduct or prejudice necessary to impose additional sanctions, the Plaintiffs cannot claim that their initial, almost non-existent, production of electronic media was substantially justified. The volume of records produced in their multiple supplements clearly establish both their ability to retrieve responsive documents, and their discoverability. In addition, while the Plaintiffs are individuals and unsophisticated in the burdens of litigation, their counsel are not. Eight lawyers from four different law firms have been engaged on the Plaintiffs' team. They have filed lengthy, detailed complaints seeking millions of dollars in damages. Several of the cases had been pending for months awaiting resolution of jurisdictional motions before discovery commenced and thus counsel should have been prepared to respond to a comprehensive set of discovery requests. Their inadequate initial response was not substantially justified.

It remains, however, for the Court to determine whether other circumstances would render an award of fees incurred in preparing and litigating the motion unjust. As set forth

elsewhere, the Defendants have never requested a specific monetary sanction. At the Court's request, however, counsel submitted an itemized statement of fees associated with their motions to compel electronic production. (ECF No. 371-1, at 7-12). This statement includes an itemized list of fees incurred between June 20 and August 20, 2014. As modified to reflect the issues addressed by this motion only, those fees total $64,514.00. Id. at 12. Given that this statement concluded before the Defendants' voluminous Facebook production, it significantly under-reports the hours spent by counsel evaluating the Plaintiffs' compliance, and certainly understates the costs spent litigating the sanctions motion itself. Nevertheless, after considering the entire scope of the discovery disputes initiated by both sides, the Court finds imposing a fee award of this size would be unjust under the circumstances of this case. Fed. R. Civ. P. 37(a)(5)(A)(iii).

Several factors suggest an award of fees would be unjust. To begin with, the Plaintiffs have already been put to significant expense defending the sanctions motion, which as set forth above, they have largely won. Second, Plaintiffs incurred over $29,000 in fees to a forensic expert in order to produce the electronically stored information from their various Facebook accounts. While discoverable, this information is only marginally relevant to the liability issues which will be contested. It is largely cumulative, and under the proportionality limits set forth in Rule 26(b)(2)(C), the cost of producing it outweighs the likely benefit of the information produced considering the needs of the case, the Plaintiffs' resources, and the importance of the discovery in resolving the issues before the Court. Indeed, although they undertook the expense of a forensic expert voluntarily, in an effort to avoid sanctions, the Court had twice suggested that the expert fees might be the measure of relief on any sanction for continued noncompliance. (Transcript of July 10, ECF No. 286, at 15, 60-61). The fact that this expense has already been

incurred, and will remain with the Plaintiffs under the terms of this Order, is a significant factor affecting the award of other costs associated with this discovery dispute. Finally, the Defendants' discovery practice contributed to the Plaintiffs' failure to meet the deadlines imposed by the Court's initial Scheduling Order. For example, each Plaintiff received two sets of Requests for Production. Counting subparts, these requests each include over 200 separately identified requests for production and five pages of definitions and instructions. E.g., Defs' Request for Production to Rachel Delorey, (ECF Nos. 229-1, 229-2). At an earlier hearing on Plaintiffs' request for a Protective Order regarding these requests, Defense Counsel defended the discovery as standard practice in that she routinely asks for documents "supporting or in any way relating to" the various allegations in each individual complaint. The length of the requests was thus made necessary by the Plaintiffs' equally verbose Complaints. While this may be a permissible means of requesting documents, it does not explain the numerous requests seeking duplicative, if not identical material.

Despite these factors suggesting fees would be unjust, the Court has also considered two other discovery disputes that inform the parties' positions. The previously resolved disputes related to video taken by a communications firm hired to create an advertising website (Cabin Fever Motion, ECF No. 294) and representations made about a mold cleaning company and its owner, who was originally identified as a Plaintiff's expert. (Expert Production Motion, ECF No. 301). In both of these cases, the Defendants have identified representations by Plaintiffs' counsel concerning the accuracy and completeness of discovery, which later proved incorrect.

In the case of Cabin Fever, counsel's representations concerned production of videotaped testimonials by two of the Plaintiffs for use in the advertising website. Only the finished videos were produced, and descriptions by counsel concerning the deleted outtakes were later

contradicted by the contractor during his deposition. In addition, multiple attorneys represented to the Court that the initial website had been taken down as a result of "overwhelming" response by other families affected by military mold. This representation later proved to be incorrect as the contractor testified that the website had only been disclosed to counsel for purposes of pre-approval.

In the case of the contested expert, counsel's representations were more substantive and relevant as they related to evidence of property damage in two Plaintiffs' homes. Throughout the early expert production, Plaintiffs had maintained that a particular company, PuroClean and its owner, Tony Ortiz, had refused to clean personal property damaged by mold because of the extent of contamination. While this representation was supported by a letter Ortiz sent to counsel in 2011, a later production established that Ortiz had cooperated with another vendor, Wondermakers, in a comprehensive cleaning of some of the same property. These materials were eventually produced by Mr. Ortiz and the Plaintiffs' counsel claimed not to be aware of the later development. However, as the production obtained through Defendants' original motion established, several of these emails were copied to counsel. Based partly on Ortiz's inconsistent positions, Plaintiffs elected to withdraw him as an expert witness.

Although these two disputes were extensively briefed, they remain tangential to the primary issues before the Court on this motion. However, in earlier resolving the related motions the Court held under advisement the Defendants' request for fees in connection with certain statements by counsel regarding the sufficiency of that production. To the extent their earlier resolution bears on the Court's Order for relief in any fashion, however, they would not increase the likelihood of case-dispositive sanctions. Primarily this is because these two disputes relate to errors by counsel and not the Plaintiffs themselves. In both cases, the primary attorneys

involved submitted detailed declarations explaining the miscommunication which led to their earlier incorrect statements. (Holt Decl., ECF No. 389-4; Baily Decl. ECF No. 389-3). After reviewing the declarations and having presided over all of the affected discovery proceedings, the undersigned accepts each statement that counsel did not deliberately misrepresent the status of production, but relied on information then provided to them by the non-parties which later proved inaccurate. While the erroneous information would likely have been discovered by a more comprehensive consultation with the non-parties regarding discovery, the Court does not find any counsel to have intentionally misrepresented the relevant circumstances.[15] Nevertheless, both matters suggest the Defendants' extensive motions practice revealed several problems in counsels' response to discovery and, at least in the case of Mr. Ortiz, substantial contrary evidence.

After considering all the foregoing, the undersigned does not find that an award of all of the fees associated with the motion to compel would be just. See Adams v. Sharfstein, 2012 WL 2992172, at *5 (D. Md. July 19, 2012), (declining to award fees due to plaintiff's limited resources); EEOC v. Dolgen Corp., LLC, 2011 WL 1260241, at *17 (M.D. N.C Mar. 31, 2011) (awarding half of incurred attorney's fees where disagreement about the nature of discovery justified some opposition briefing). But some award of fees is necessary to fulfill the mandate of Rule 37(a) and to discourage the original non-compliance that gave rise to Defendants' original motion to compel. (ECF No. 263). Accordingly, Defendants are DIRECTED to submit by **January 14, 2015** affidavits or other support for the reasonableness of the $64,515 fees incurred both as to rate and number of hours. The Defendants may also include a brief of no more than

---

[15] Neither of the declarations explain why several attorneys suggested that the Cabin Fever website was taken down due to a "flood" of responses, when in fact it had never been made public. In light of the number of cases and lawyers involved, the Court will presume these erroneous statements were merely puffery which, in any event, did not go directly to the discovery issues being addressed.

five pages setting forth their request for an appropriate fee in light of the foregoing analysis.  The Plaintiffs may submit opposing affidavits or declarations and their own five page brief on or before **January 28, 2015**.  No further briefing and no exhibits unrelated to the reasonableness of fees will be permitted as the Court will rule on the issue of fees due under Rule 37(a) within 10 days of receiving the briefs.

## IV.   CONCLUSION

Accordingly, for the foregoing reasons the Defendants' motion for sanctions is GRANTED IN PART and DENIED IN PART.  The Plaintiffs shall bear the cost of expert production of electronic media in the amount of $29,220.04.  (ECF No. 372-1, at 3).  The court shall also award a portion of the fees incurred by the Defendants in bringing the Motion to Compel after evaluating the facts required by Rule 37(a)(5)(A).  To the extent Defendants' motion sought other or further relief, it is DENIED.

/s/

Douglas E. Miller

United States Magistrate Judge

_____

DOUGLAS E. MILLER

UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia

December 31, 2014